YAAKOV M. ROTH
Acting Assistant Attorney General, Civil Division
JAMIE ANN YAVELBERG
COLIN M. HUNTLEY
ELSPETH A. ENGLAND
Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 261
Benjamin Franklin Station
Washington, D.C.  20044
Telephone: (202) 514-8746
Elspeth.A.England@usdoj.gov

MICHELE BECKWITH
Acting United States Attorney
DAVID E. THIESS
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, California 95814
Telephone: (916) 554-2700
David.Thiess@usdoj.gov

Attorneys for the United States

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel*. TONI S. LEE,<br><br>                    Plaintiffs,<br><br>v.<br><br>BARCO UNIFORMS, INC.; KENNY CHAN; DAVID CHAN; ABLE ALLIED LIMITED; NATHAN GLOBAL DIRECT, INC.; J&K GARMENT, INC.; MEGA GOODWILL LTD; JS GARMENT CO.; and SUPERWAY IMPORT & EXPORT, INC.,<br><br>                    Defendants. | CASE NO. 2:16-CV-1805 DC-JDP<br><br>**COMPLAINT IN INTERVENTION**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I.  NATURE OF ACTION.................................................................................................4

II.  INTRODUCTION ....................................................................................................4

III.  PARTIES .................................................................................................................7

IV.  JURISDICTION AND VENUE.................................................................................9

V.  THE FALSE CLAIMS ACT ....................................................................................10

VI.  UNITED STATES CUSTOMS DUTIES, LAW, AND PROCESS ....................................11

    A.  Legal Requirements for Importation of Goods to the United States.........................11

    B.  The Role of International Commercial Terms ("Incoterms") in Contracts for
           Imported Goods .................................................................................................15

VII.  DEFENDANTS' SCHEME TO UNDERPAY CUSTOMS DUTIES .................................17

    A.  Relationship Between Barco and the Chans and Development of the Scheme ..............17

    B.  Barco Directed and Recorded the Fraud Scheme through "Cost Sheets"..............21

    C.  The Double Invoicing Scheme...................................................................32

    D.  Additional Examples of the Conspiracy and Fraud ..................................................35

        1.  Example 1: Fake Invoice and Falsified Entry Document............................35

        2.  Example 2: Falsified Cost Sheet and Entry Document ................................36

        3.  Examples 3 & 4: Falsified Cost Sheets and Entry Document ....................37

    E.  Defendants Concealed the Scheme and Attempted to Evade Detection................................39

        1.  The Chans Used Evolving Entity Names to Avoid Scrutiny.......................39

        2.  Barco's Active Concealment and Evasion of Scrutiny ................................42

        3.  2021: The Scheme Continues and a New Entity Emerges ..........................44

VIII.  CAUSES OF ACTION..........................................................................................45

IX.  COUNT I..............................................................................................................45

X.  COUNT II.............................................................................................................46

XI.  COUNT III...........................................................................................................47

XII.  COUNT IV ...........................................................................................................49

XIII.  PRAYER FOR RELIEF .......................................................................................49

XIV.   JURY DEMAND..................................................................................................................50

# I.     <u>NATURE OF ACTION</u>

Pursuant to the False Claims Act ("FCA"), 31 U.S.C. § 3729(a) *et seq.*, the United States brings this action to recover damages and civil penalties stemming from the fraudulent undervaluation, fraudulent declaration, and underpayment of customs duties; false documentation created to support such underpayment; and conspiracy to do the same.  Defendants' conduct entitles the United States to recover under the FCA and to relief under the doctrine of unjust enrichment.  Having filed a Notice of Election to Intervene in Part pursuant to 31 U.S.C. § 3730(b)(4)(A), the United States alleges as follows:

# II.     <u>INTRODUCTION</u>

1.     Defendant Barco Uniforms, Inc. ("Barco") sells licensed uniforms to large businesses, including restaurant and fast-food chains and health care providers.  For years, Defendants Kenny Chan and David Chan ("the Chans"), through the constellation of business entities they operate have been one of Barco's top suppliers.  This Complaint refers to the defendant companies operated by the Chans as the "Defendant Chan Companies," as well as referring to the Chans and the Defendant Chan Companies together as the "Chan Defendants."

2.     Originally operating a factory in California, Kenny Chan moved the Chan companies' operation to the People's Republic of China ("the PRC") in 2003 or 2004 to reduce manufacturing costs and provide lower prices to their customers, including Barco.  Since at least 2004, the garments the Chan Defendants have sold to Barco have been manufactured in the PRC and then imported into the United States from the PRC.  Upon receipt, Barco supplies the garments to large chain restaurants, retailers, and similar businesses in the United States.  Barco's customers are U.S.-based companies, including several nationally known brands, with licensed or trademarked brands prominently featured on the imported garments. Barco's customers tightly control their licenses and trademarks.

3.     Purchases of commercial apparel imported from the PRC have been subject to international duties and tariffs for decades. Tariff Act of 1930; 19 U.S.C. § 1 *et seq.*; 19 U.S.C § 1202 *et seq.*  In general, customs duties for apparel imports are calculated based on the value of the goods declared to U.S. Customs and Border Protection ("CBP") on an Entry Summary (hereinafter "Entry Summary/Form 7501"). The Defendants engaged in a conspiracy and scheme to withhold rightful customs duties on imported commercial apparel primarily by undervaluing the apparel. Because customs

duties are based on the transaction value of the apparel, the fraudulently low values that Defendants caused to be submitted led to fraudulently low calculations of the customs duties owed.

4.    To obscure their conduct, the Chans referred to their companies by myriad different names during the relevant period, including repeatedly adopting a new name in response to the United States' investigative inquiries.  Regardless of the name, the companies owned and operated by the Chans were substantially identical, and the business relationship and scheme between Barco and the Chan Defendants remained the same.

5.    Barco conspired with the Chan Defendants to fraudulently withhold the correct amount of duties owed on these transactions by falsely reporting the value of the items purchased.

6.    The Defendants' fraudulent scheme was memorialized in part in a document called a "cost sheet" which Barco regularly created and scrutinized before awarding business to the Chan Defendants so that Barco could reap the benefit of the discount (*i.e.* the underpaid duties).  Barco solicited the underpayment of duties by proposing on the cost sheets that the Defendant Chan Companies underpay duties and by accepting bids from the Chan companies that included patently underpaid customs duties.

7.    The Defendants then advanced their conspiracy by using two sets of invoices for the same transactions— one accurate set of invoices that reflected the actual prices of the garments sold to Barco by one of the Defendant Chan Companies ("real invoices") and one fake set of invoices ("fake invoices") submitted to customs brokers for the purpose of causing the brokers to misrepresent to CBP artificially low prices on the Entry Summaries/Form 7501s.  The misrepresentation of value on Entry Summaries/Form 7501s caused by the fake invoices resulted in fraudulently low duties.  Barco paid the Defendant Chan Companies based on the real invoices which were never provided to customs brokers or CBP as part of the import process.  The fake invoices did not represent any genuine financial transactions and were created solely to support artificially low values on the Entry Summaries/Form 7501s submitted to CBP.

8.    The Defendants knew that withholding duties rightfully owed was unlawful.  Barco benefitted from the under-payment of customs duties because it allowed Barco to under-bid competitors and secure business. The Chan Defendants benefitted by securing Barco's business and pocketing, as

1    profit, money that was legally due to CBP for duties.

2          9.      For example, when Barco was attempting to win business from a U.S. fast-food chain to

3    supply their uniforms, it obtained bids from its suppliers, including the Defendant Chan Companies, to

4    manufacture those uniforms.  All suppliers submitted a bid on a cost sheet to Barco that itemized all the

5    costs including duties.  The Defendant Chan Companies, however, submitted a bid that arrived at the

6    price through calculations that knowingly and improperly underpaid duties and bestowed the benefit of

7    that cost-savings on Barco.  Other suppliers submitted bids that properly calculated duties and were

8    therefore commonly higher prices than the Defendant Chan Companies' bids.  For instance, for a

9    uniform shirt with a customs duty rate of 20%, the Defendant Chan Company would submit a bid on a

10   cost sheet of $10 for all aspects of manufacturing, supplying, and delivering the shirt, plus $1 in duties,

11   for a total price of $11.  Duties on a shirt valued at $10 with a 20% duty rate should be $2, hence the

12   face of the bid/cost sheet indicated that the Defendant Chan Company intended to underpay customs

13   duties. Barco then awarded the business to the Defendant Chan Company.  With the knowledge and

14   coordination of Barco, the Chan Defendants arranged for the Entry Summary/Form 7501 to misrepresent

15   to CBP that the shirts were purchased for $5 each, supported by a fake invoice showing the purchase for

16   $5, and thus declare the payable duties as $1 per shirt.  In other words, the Defendant Chan Company

17   bid to Barco that they would pay $1 in customs duties and then worked backwards from that $1 to create

18   a corresponding fake price (and fake invoice) to be submitted to customs brokers or CBP to support the

19   false Entry Summary/Form 7501.  The fake $5 price was sometimes even less than it cost the Defendant

20   Chan Companies to manufacture each shirt.  In this example, Barco actually paid the Defendant Chan

21   Company $11 for each shirt, as reflected in the real invoice that was concealed from customs brokers

22   and CBP.

23         10.     This scheme is commonly referred to as "double invoicing."

24         11.     Across millions of items imported, these "discounts" obtained by false submissions to

25   CBP enabled Barco to win business from customers in a competitive industry, edging out law-abiding

26   competitors, and at the expense of millions of dollars in duty revenue that should have been paid to the

27   United States under well-established customs law.  Similarly, the Chan companies under-bid other

28   Barco suppliers and profited by securing the business and paying less in customs duties than was due.

12.    As the scheme and conspiracy evolved, Barco and the Chan Defendants began intentionally leaving Barco's name off the Entry Summaries/Form 7501s to avoid detection of the conduct and as a contrivance to shirk legal liability.  In contrast, when Barco purchased products from international manufacturers not affiliated with the Chans, including those in the PRC, Barco was usually identified on the Entry Summary/Form 7501.

13.    This Action seeks recovery of damages and penalties related to the underpayment of customs duties based on Barco's purchases from the Chan Defendants between January 2012 and December 2021.  As the United States is intervening in a *qui tam* action, which relator Toni Lee filed in August 2016, this Complaint relates back to the filing date of the complaint of the person who originally brought the action and is timely under the FCA's statute of limitations.  *See* 31 U.S.C. §§ 3731(b), (c).

### III.    **PARTIES**

14.    Plaintiff United States of America brings this Action on behalf of CBP, which regulates the importation of goods into the United States, including the collection of duties and tariffs owed on imported merchandise.

15.    Barco Uniforms, Inc. is a privately held corporation established in Delaware and registered to do business in California as well as other states.  Its principal office and warehouse are in Gardena, California.  Barco's business includes selling commercial uniforms and other apparel to restaurants, retailers, health care providers, and other businesses.  Barco was founded in 1929, and since 1981, Barco has been directed by its current Chairman of the Board, Michael Donner ("Donner").  Barco has acquired and imported merchandise internationally for decades.

16.    Defendant Kenny Chan is a resident of Texas and formerly a resident of the PRC and California.  Through the companies he has owned and operated, Kenny Chan has been involved in international trade for decades.  When the Chans' factory moved from California to the PRC, Kenny Chan relocated to the PRC to run the factory and business there.  Kenny Chan is the father of Defendant David Chan.

17.    Defendant David Chan is a resident of Hong Kong.  David Chan was a resident of California until 2018, when he became aware of the United States' investigation of this matter. Through the companies he has owned and operated with his father Kenny Chan, David Chan has been involved in

international trade for numerous years preceding the time period at issue in this Action. Prior to departing for Hong Kong, David Chan remained in the United States to serve as the Defendant Chan Companies' liaison to Barco and often attended in-person meetings at Barco.

18.    Defendant Able Allied Limited ("Able Allied") was registered in the British Virgin Islands with business addresses in Hong Kong. It has not registered to do business in the United States. As of November 2015, Able Allied's website (now defunct) listed an address in Alhambra, California. This website also identified its "foreign address" as Huaian Y & D Garment Company Limited (another corporate entity operated by Kenny and David Chan), with a street address in Huaian City, Jiangsu, China. As discussed below, Able Allied Limited later operated under the name Mega Goodwill. During the time period relevant to this Action, Able Allied Limited was operated and controlled by Defendants Kenny Chan and David Chan.

19.    Defendant Nathan Global Direct, Inc. ("NGD"), is a corporation established in California, with a registered address in South Pasadena, California. David Chan is listed as the registered agent. NGD was listed on Defendant J&K Garment, Inc.'s now-defunct website as the "USA contact office" from 2009-2012. Similarly, a company profile provided by the Chans to Barco listed the company as "J&K, Nathan Global Direct (USA), Suzhou New J&K Garment." During the time period relevant to this Action, NGD was operated and controlled by Defendants Kenny Chan and David Chan.

20.    Defendant J&K Garment, Inc. (also known as Suzhou New J&K Garment Company, New J&K Garment, and New JK Garment) (hereinafter referred to as "J&K Garment"), is a corporation established in California, with a registered address in South El Monte, California. During the time period relevant to this Action, J&K Garment, Inc. was operated and controlled by Defendants Kenny Chan and David Chan. A company profile maintained by Barco and the email signature blocks of the Chans identify Suzhou New J&K Garment as the "China" office of the Chan company. Several of the Defendant Chan Companies' factories in the PRC display a "J&K Garment" logo on the side of the building.

21.    Defendant Mega Goodwill Limited ("Mega Goodwill") is registered in the British Virgin Islands with associated Hong Kong addresses listed on invoices to Barco. It is the purported successor to Defendant Able Allied Limited. The Chans changed the name of Able Allied to Mega Goodwill after

learning of the United States' investigation of this matter. Mega Goodwill emerged after the United States served David Chan with a Civil Investigative Demand and he left for Hong Kong. During the time period relevant to this Action, Mega Goodwill was operated and controlled by Defendants Kenny Chan.

22.    Defendant JS Garment Company Limited (also known as Guannan JS Garment Company Limited) is a corporation established in California, with a registered address in Pasadena, California. During the time period relevant to this Action, JS Garment Company Limited was operated and controlled by Defendants Kenny Chan and David Chan. The name JS Garment Company Limited was associated with a factory in Lianyungang, PRC, which Barco represented to third-party auditors was the "same family ownership" as the other Chan factories.

23.    Defendant Superway Import and Export, Inc. is a corporation established in California, with a registered address in Alhambra, California. Kenny Chan is listed as the registered agent. During the time period relevant to this Action, Superway Import and Export, Inc. was operated and controlled by Defendants Kenny Chan and David Chan.

24.    This Complaint collectively refers to Defendants Able Allied Limited, Nathan Global Direct, Inc. J&K Garment, Inc., Mega Goodwill Limited, JS Garment Company Limited, and Superway Import and Export, Inc. as the "Defendant Chan Companies." The Defendant Chan Companies are virtually identical to each other with no meaningful distinctions among the corporate entities. Each of the Defendant Chan Companies was operated by Kenny and David Chan from both the PRC and California during the relevant time period. The Defendant Chan Companies share employees, operations, factories, and control with other businesses in the PRC that are operated by Kenny Chan and David Chan.

### IV.    JURISDICTION AND VENUE

25.    This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331, 1345, and 1367(a).

26.    This Court may exercise personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732 and because Barco has transacted business in the Eastern District of California, including by selling uniforms to retailers located in Sacramento, California. In addition, the Chan Defendants and their Defendant companies have each transacted business in the Eastern District of California including

1    by selling apparel to Barco Uniforms and maintaining a business presence in this District.

2        27.    Venue is proper in the Eastern District of California under 31 U.S.C. § 3732 and 28

3    U.S.C. § 1391(b) because all Defendants have transacted business in this District including manufacture,

4    importation, and sale of items used by businesses in the Eastern District of California and because a

5    substantial part of the events giving rise to this Action occurred in this District.

6                        V.    **THE FALSE CLAIMS ACT**

7        28.    The FCA is the primary civil statute designed to combat fraud upon the United States and

8    reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud

9    against the Government."  S. Rep. No. 99-345, at 1 (1986), 1986 U.S.C.C.A.N. 5266.

10       29.    A defendant violates the FCA, *inter alia*, when it "knowingly makes, uses, or causes to

11   be made or used, a false record or statement material to an obligation to pay or transmit money or

12   property to the Government."  31 U.S.C. § 3729(a)(1)(G).

13       30.    A defendant also violates the FCA when it "knowingly conceals or knowingly and

14   improperly avoids or decreases an obligation to pay or transmit money or property to the Government."

15   *Id.*

16       31.    Section 3729(a)(1)(G) is known as the "reverse false claims" provision of the FCA.

17       32.    A defendant also violates the FCA when it "conspires to commit a violation of" the FCA.

18   31 U.S.C. § 3729(a)(1)(C).

19       33.    A Defendant has liability even where another entity makes the actual submission to the

20   United States.  *Tanner v. United States*, 483 U.S. 107, 129 (1987) ("the fact that a false claim passes

21   through the hands of a third party on its way from the claimant to the United States does not release the

22   claimant from culpability under the Act").  That includes the customs duty context.  *United States ex rel.*

23   *Taylor v. GMI USA Corp.*, 714 F. Supp. 3d 275, 289 (S.D.N.Y. 2024) ("Because Defendants were not

24   the importer of record, they argue,  . . . they cannot be liable for false information presented in the

25   Customs entry documents. Not so. The False Claims Act imposes liability on a person who 'knowingly

26   makes, uses, or causes' a false record or statement 'to be made or used.'" (citing 31 U.S.C.

27   § 3729(a)(1)(G)).

28       34.    The term "material," as used in the FCA, "means having a natural tendency to influence,

or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

35.     Under the FCA, the terms "knowing" and "knowingly" mean that the defendant had actual knowledge of or acted in deliberate ignorance or reckless disregard of information relating to the truth or falsity of the information at issue.  31 U.S.C. § 3729(b)(1)(A).

36.     The FCA does not require proof of specific intent to defraud the Government.  *Id.* § 3729(b)(1)(B).  The terms "knowing," "knowingly," "knowledge," "knows," and "knew," as used in this Complaint, have the meaning ascribed to them by the FCA.

37.     The FCA imposes liability of treble damages plus a civil penalty for each false claim in an amount (as pertinent here) not less than $5,000 and not more than $10,000, as adjusted for inflation by statute, including, but not limited to, the Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 701, 129 Stat. 584, 599-601 (2015). *See* 28 C.F.R. § 85.5 (identifying applicable inflation adjustments); 31 U.S.C. § 3729(a)(1).

## VI.     UNITED STATES CUSTOMS DUTIES, LAW, AND PROCESS

### A.     Legal Requirements for Importation of Goods to the United States

38.     The United States imposes customs duties on imports of goods from foreign countries. The United States levies customs duties to protect the country's economy, residents, jobs, and environment, by controlling the flow of goods into the country.  Such duties are also a source of economic revenue for the United States.

39.     The customs process is regulated by United States Customs and Border Protection. 19 U.S.C. § 1, *et seq*.  CBP collects information from parties importing goods into the United States and assesses duties before the imported goods can be released to parties within the country (called "permitting entry").

40.     It is unlawful "to import into the United States any merchandise of foreign manufacture if such merchandise, or the label, sign, print, package, wrapper, or receptacle, bears a trademark owned by a citizen of, or by a corporation" unless the trademark owner permits it.  19 U.S.C. § 1526.  These trademarks include the logos, emblems, and insignia of well-known American brands, such as fast-food chains and media companies.

41.     Merchandise imported into the United States must be "entered," which means that

documentation or data regarding the import must be filed with CBP upon each import of merchandise. 19 U.S.C. § 1484(a)(2); 19 C.F.R. §§ 141.4, 142.3.  This information allows CBP to assess the customs duties due on the goods being imported into the United States.  Customs duties are assessed at the time of entry.

42.    The document required to be filed with CBP to complete an entry is called an Entry Summary and is often reflected on the Entry Summary/Form 7501.[1]  An Entry Summary may be filed in hardcopy (on Form 7501) or electronically using CBP's Automated Commercial Environment (ACE) system.  The information in the electronic entry summary is identical to the Form 7501.  *See* 19 U.S.C. § 1484; 19 C.F.R. Part 143.

43.    The submission of the Entry Summary/Form 7501 requires as support: (1) a bill of lading or air waybill; and (2) a commercial invoice verifying the value of the merchandise being imported. *See, e.g.,* 19 C.F.R. §§ 141.11, 141.19(a), 141.81, 141.86(a), 142.3(a), 142.6(a), 152.3.

44.    The amount of duties owed to the United States is based on the value of the merchandise being imported.  19 U.S.C. § 1401a; 19 C.F.R. § 152.101.

45.    The primary method to calculate value for imported goods is "transaction value."  19 U.S.C. § 1401a(1); 19 C.F.R. §§ 152.101(b), 152.103(j).  Transaction value was the valuation method used by the Defendants in this Action.  Transaction value is defined as "the price actually paid for the merchandise when sold for exportation to the United States," plus certain other amounts (such as packing costs, sales commissions, and royalties or license fees). 19 U.S.C. § 1401a(b)(1)(A)-(E).  Thus, under the statute, the value of imported merchandise is the amount paid for the merchandise by the party causing it to be imported into the United States.

46.    The duty rate for each item of merchandise depends on the country of origin and the type of item being imported.  19 C.F.R. §§ 152.11-17.  Imported items are classified based on the Harmonized Tariff Schedule ("HTS") maintained by the United States International Trade Commission. 19 U.S.C. § 1202; 19 C.F.R. § 152.11.  The HTS assigns each item a 10-digit code based on its materials, intended use, and method of creation (*e.g.*, HTS code 6109.10.0004 for "Men's or Boys'

---

[1] *Available at* https://www.cbp.gov/sites/default/files/assets/documents/2023-Nov/CBP%20Form%207501.pdf (last accessed April 8, 2025).

1    Cotton T-shirts, Knit or Crocheted"). The HTS code also indicates the general customs duties rate to be

2    assessed on each item.

3          47.    Although the transaction value of goods is generally considered the price paid for the

4    merchandise by the importer, the value declared must also include any discounts or "assists," such as

5    when a manufacturer obtains the fabric for free. 19 U.S.C. § 1401a(b)(1)(C); *U.S. v. Trek Leather, Inc*.,

6    767 F.3d 1288 (Fed. Cir. 2014) ("To address such an artificial reduction of customs duties, the statute

7    and regulations expressly require that the value of an 'assist' be incorporated in specified circumstances

8    into the calculated value of imported merchandise used for determining the duties owed.") (citing 19

9    U.S.C. § 1401a(a)(1),(b)(1), (e)(1); 19 C.F.R. §§ 152.101(b)(1), 152.103(a), (b), (d)); *see generally* 19

10   U.S.C. §§ 1401a (value), 1500 (appraisal), 1503 (dutiable value).

11          48.    Under 19 C.F.R. § 141.86(a), the commercial invoice supporting an Entry

12   Summary/Form 7501 must set forth, among other things:

13   - The United States port of entry to which the merchandise is destined;

14   - A detailed description of the merchandise, including the name by which each item is
15     known, the grade or quality, and the marks, numbers, and symbols under which sold by
       the seller or manufacturer to the trade in the country of exportation;

16   - The marks and numbers of the packages in which the merchandise is packed;

17   - The weights and quantities of the merchandise;

18   - The purchase price of each item in the currency of the purchase; and

19   - All charges upon the merchandise itemized by name and amount, including freight,
20     insurance, commission, cases, containers, coverings, and cost of packing; and if not
       included above, all charges, costs, and expenses incurred in bringing the merchandise
       from alongside the carrier at the port of exportation in the country of exportation and
21     placing it alongside the carrier at the first United States port of entry.

22          49.    In addition to the requirements for the supporting commercial invoice, the Entry

23   Summary/Form 7501 contains more than 40 fields representing information such as port of entry, HTS

24   code, country of origin, import and export dates, importer of record, ultimate consignee, description of

25   the goods, duty rates, and duties owed.  *See* Ex. 1 (sample Entry Summary/Form 7501).  Each of these

26   fields is a representation submitted to the United States.

27          50.    Under the statute governing entry of merchandise, 19 U.S.C. § 1484, a party qualifying as

28   importer of record includes either owner, purchaser, consignee, broker, or agent in writing.  19 U.S.C.

§ 1484(a)(2)(B).  In other words, the parties qualifying as importer of record extend beyond the one entity that the parties to the transaction select to be listed as the importer of record on the Entry Summary/Form 7501 submitted to CBP.

51.     Under the same statute, a "part[y] qualifying as 'importer of record' under paragraph (2)(B)" is required to exercise "reasonable care" with respect to the entry of goods, documentation filed with the entry, and other actions and information.  19 U.S.C. §1484(a)(1).

52.     The required Entry Summary/Form 7501 may be filed by anyone qualifying as the importer of record, including the owner, ultimate consignee, customs broker, or agent in writing.  19 U.S.C. § 1484(a)(2)(B).

53.     A party qualifying as the importer of record is also responsible for paying the customs duties at the time of entry.  19 U.S.C. § 1484(a)(1).

54.     The Entry Summary/Form 7501 requires the importer of record to identify itself and provide proper identifying information for tracking purposes, including the importer number.  19 C.F.R. § 141.61(d).

55.     Generally, when a party has purchased the merchandise from a foreign party and arranges for it to be brought into the United States, that purchasing party is listed as the importer of record on the Entry Summary/Form 7501, though other parties besides the purchaser are eligible to be listed as importers of record under the statutory definition.

56.     According to the applicable CBP Directive, the purchasing entity to whom the entry is destined (if the goods have been sold before import) or the party under contract to sell the goods within the United States, is known as the "ultimate consignee."  CBP Directive No. 3550-079A (June 27, 2001).

57.     The importer of record may provide information and pay customs duties either personally or through an agent assigned in writing.  An assigned agent may include a customs broker or a consignee.  Use of an assigned agent does not relieve the importer of record of its responsibilities.  *See*, *e.g.*, 19 C.F.R. § 141.1(b).

58.     The Entry Summary/Form 7501 must be submitted and certified by the importer of record or the owner or an agent (such as a customs broker).  19 C.F.R. § 141.61(a). The declarations on

the Entry Summary/Form 7501 include:

> I declare that I am the ☐ importer of record and that the actual owner, purchaser, or consignee for CBP purposes is as shown above, OR ☐ owner or purchaser or agent thereof.
>
> I further declare that the merchandise ☐ was obtained pursuant to a purchase or agreement to purchase and that the **prices set forth in the invoices are true,** OR ☐ was not obtained pursuant to a purchase or agreement to purchase and the statements in the invoices as to value or price are true to the best of my knowledge and belief.
>
> I also declare that the **statements in the documents herein filed fully disclose to the best of my knowledge and belief the true prices, values,** quantities, rebates, drawbacks, fees, commissions, and royalties and are true and correct, and **that all goods or services provided to the seller of the merchandise either free or at reduced cost are fully disclosed**. I will immediately furnish to the appropriate CBP officer any information showing a different statement of facts.

(emphasis added); *see also* <u>Ex. 1</u>.  The electronic Entry Summary is binding in the same manner and to the same extent as the paper Form 7501.  *See* 19 U.S.C. § 1484(d)(1); 19 C.F.R. §§ 141.61(a)(2), 143.32.

59.    In this Action, the Defendants knowingly submitted, or caused others to submit Entry Summaries/Form 7501s containing false information in several fields, including, most importantly, "value."  (*See* <u>Ex. 1</u>, fields 32 and 35).  In furtherance of the conspiracy, Defendants also at various times knowingly submitted, or caused others to submit, Entry Summaries/Form 7501s containing false HTS codes (field 29), item descriptions (field 28), and quantities (field 31).  Further, Defendants knowingly submitted, or caused others to submit, false certifications (field 36).

**B.    The Role of International Commercial Terms ("Incoterms") in Contracts for Imported Goods**

60.    When businesses buy and sell goods in the global market, they negotiate the basic terms of sale (such as price, quantity, and characteristics), as well as a set of International Commercial Terms, also known as "Incoterms."  These terms are available online through the International Chamber of Commerce.[2]  They use standardized terminology, are internationally recognized, and are used

---

[2] *See International Chamber of Commerce at www.iccwbo.org/products-and-services/trade-facilitation/incoterms-2010.*

worldwide in contracts for the sale of goods.  First published in 1936, Incoterms provide internationally accepted definitions and rules of interpretation for most common commercial terms.

61.    The incorporation of Incoterms in international sales contracts allocate responsibilities among customers and suppliers, among other fundamental conditions.  The parties select the terms to use.  These terms determine, for example, who pays the cost of each transportation segment, who is responsible for loading and unloading of goods, and who bears the risk of loss at any point during an international shipment.  Two sets of Incoterms rules relevant in this Action are known as "Delivered Duty Paid" and "Free On Board."

62.    The Incoterms rules define Delivered Duty Paid ("DDP") to mean:

> the seller delivers the goods when the goods are placed at the disposal of the buyer, cleared for import on the arriving means of transport ready for unloading at the named place of destination. The seller bears all the costs and risks involved in bringing the goods to the place of destination and has an obligation to clear the goods not only for export but also for import, to pay any duty for both export and import and to carry out all customs formalities.

63.    Thus, under the DDP definition, the seller obtains at its own risk and expense any export and import license and other official authorization.  The seller also carries out, where applicable, all customs formalities necessary for the export of the goods, for their transit through any country, and for their import.  In addition, the seller pays the costs of transportation, insurance, and all duties, taxes, and other charges.

64.    The Incoterms rules define Free On Board ("FOB") to mean:

> the seller delivers the goods on board the vessel nominated by the buyer at the named port of shipment or procures the goods already so delivered. The risk of loss of or damage to the goods passes when the goods are on board the vessel, and the buyer bears all costs from that moment onwards.

65.    Thus, FOB, in contrast to DDP, means that the buyer must obtain at its own risk and expense any import license or other official authorization. The buyer must carry out, where applicable, all customs formalities for the import of the goods. In addition, the buyer must pay all duties, taxes, and other charges upon import of the goods and for their transit through any country. *See "FOB Incoterms 2010: International Chamber of Commerce Official Rules for the Interpretations of Trade Terms,"*

1  *available at http://www.iccwbo.org/products-and-services/trade-facilitation/incoterms-2010/.*

2  66.    Incoterms agreed to between buyers and sellers, however, have no legal effect on the

3  United States or other sovereign nations.  The United States is not a party to any private contract

4  selecting particular Incoterms.  Though two private parties may agree on which party is contractually

5  obligated to submit information regarding the transaction and pay duties, this contract cannot relieve

6  either party of the requirement to comply with U.S. law and CBP regulations.  Incoterms, therefore,

7  cannot prevent civil liability owed to the United States for violations of law or manipulation of customs

8  duties.

9  ## VII.    DEFENDANTS' SCHEME TO UNDERPAY CUSTOMS DUTIES

10  **A. Relationship Between Barco and the Chans and Development of the Scheme**

11  67.    Kenny Chan began operating a garment factory in Los Angeles, California in

12  approximately 1983.  Around 1986, Kenny Chan and the companies he controlled began doing business

13  with Barco, manufacturing and supplying apparel garments to Barco from their Los Angeles factory.

14  68.    Around 2003-2004, facing rising domestic manufacturing costs, Kenny and David Chan

15  moved their factory to the PRC.  Kenny Chan moved abroad to the PRC while David Chan remained in

16  California to operate the Los Angeles area office.

17  69.    After Kenny and David Chan moved their factory to the PRC, their business relationship

18  with Barco grew, and Barco became the Chan companies' most substantial customer.  Similarly, the

19  Chans became one of Barco's top suppliers.

20  70.    Throughout the time period relevant to this Action, the Chans (through the Defendant

21  Chan Companies and their employees) worked directly with Barco on all aspects of supplying the

22  commercial uniforms that Barco sold to its customers.  Despite the various corporate names for the

23  Defendant Chan Companies that appeared on emails and transactional paperwork sent to Barco, those

24  companies acted interchangeably, without regard to corporate formalities, as one central entity with a

25  common identity, controlled by the Chans.  None of these companies served as an independent corporate

26  entity between the Chans and Barco or served any unique function.

27  71.    Indeed, the Defendant Chan Companies were marketed to Barco and Barco's customers

28  as a centralized operation that worked directly with Barco.  For example, the Chan Defendants created a

company profile for Barco to share with its customers that spoke of a single Chan entity simultaneously calling itself "J&K Garment, Nathan Global Direct Inc. (U.S.A.), and Suzhou New J&K Garment Co., Ltd (China)."  *See* Ex. 2.  This company profile stated that "[a]s a direct garment manufacturer, we can cut down on middleman costs, and also have the ability to tackle each project more efficiently… ."  This profile provided detailed information, including pictures, of the companies' factories in the PRC and the capacity of each.  In other words, although the Chans created many corporate forms that conducted business under different names, one of the advantages they marketed to Barco was the ability to serve as the manufacturer and direct supplier to Barco.

72.     Around 2011 and 2012, Barco noticed quality problems with items supplied by some of the Defendant Chan Companies.  Barco discovered that the Chans and their companies had subcontracted to non-Chan factories and these subcontractors were responsible for the problem items.

73.     Addressing this issue, in February of 2012, from a J&K Garment, Inc. email address and with an email signature bearing the names of two different Defendant Chan Companies, David Chan emailed Michael Donner and two other Barco employees to state:

> For the last twenty-six years. NGD has taken great pride in working with Barco and supplying with quality garments. ….Throughout the many years we have worked together, there has never been such an abundance of 'problem' goods shipped from our factory. .. Moving forward, we are now adding additional quality personnel (both here and in China) …. Individuals are being replaced in our China factory… We look forward to continuing our business relationship together and to moving forward with new controls in place that will result in quality garments being produced by NGD.
> Best Regards,
> David Chan
> Nathan Global Direct (USA) Suzhou J&K Garment Co Ltd. (China).

74.     In addition to these steps, the Chan Defendants later confirmed that they were no longer using any subcontractors, would complete everything in-house, new automatic machines were purchased for the Suzhou factory, and two "new lines" for knitwear were added at the Suzhou factory.

75.     Around the same time, Barco updated their contract for all suppliers to prohibit subcontracting.  This prohibition buttressed the legal obligations Barco owed to its customers to strictly control the supply chain to protect its customers' licensed and trademarked logos.

76.     In addition to a direct and close business relationship, Barco's Board Chairman Michael Donner cultivated a very close friendship with Kenny Chan and his son, David Chan, even corresponding about private medical issues and sharing personal confidences. As Donner summarized in 2019: "We have been doing business with Kenny for many years.  I estimate it has been around 35 years.  Over these years we have built a special friendship and a great trust."

77.     Arising from their close business and personal relationship, the Chan Defendants and Donner agreed to under-pay customs duties on the commercial uniforms that Barco bought from the Defendant Chan Companies.

78.     The Defendant Chan Companies often were able to provide the lowest price by giving Barco a discount practically equal to the underreported duties.  That resulted in Barco winning more business from its customers and funneling more business to the Defendant Chan Companies.

79.     When Barco felt the need to lower its prices to the maximum extent to win a contract, Donner directed business to the Defendant Chan Companies, with the knowledge that the customs duties would be under-paid.  The prices obtained through these means from the Chan Defendants were lower than even the lowest possible prices that had been negotiated through honest means by Barco employees responsible for pricing and negotiation with suppliers, such as relator Toni Lee (former Director of Product Commercialization) and J.C. (Barco Vice President of Supply Chain).

80.     Barco particularly relied on the falsification of duties with respect to uniforms supplied to fast food chains and other national retailers (which Barco has called its "identity" business) because those large customers typically request the most competitive pricing.

81.     The strategy to under-pay duties was cemented in 2011 after Barco won a contract with Fast Food Chain 1 to supply a line of new uniforms.  Some Barco employees had grown concerned about the amount of business directed to the Defendant Chan Companies and had been trying to diversify Barco's suppliers.  As a result, Barco used bids from a low-cost supplier that was not affiliated with the Chans to seek the new line of uniforms for Fast Food Chain 1.  Barco won Fast Food Chain 1's contract based on the new supplier's bid.  But that supplier ultimately produced an unacceptable product and promised only delays. At that time, Barco's business with Fast Food Chain 1 had reached $5 million in total sales, and Fast Food Chain 1 expected delivery of the uniforms according to the specific

1    schedule and price it had awarded.  Barco therefore needed to find a replacement supplier at a similar

2    price with a short turnaround time.  Donner stepped in and directed the business to the Defendant Chan

3    Companies.  Through Defendant NGD, the Chans and Barco met Fast Food 1's contract price by

4    manipulating the customs duties paid on the uniforms.  NGD filled the order on a short turnaround

5    without going over the contract price.  As J.C. explained in testimony taken under oath during the

6    investigation of this matter, Donner advised J.C. that the only option to reach that price was to alter

7    customs duties—the deal Donner personally negotiated with NGD.

8        82.    As Barco sought continued business from fast food chains and other "identity"

9    customers, Donner would often specify a price he thought Barco needed to reach to win the contract.

10    Donner's stated price often fell below the lowest price that had been negotiated by Barco pricing

11    employees who had solicited competitive bids from various suppliers, including the Defendant Chan

12    Companies.  When those employees told Donner that his stated price was not possible, Donner often

13    reached his target price with the Defendant Chan Companies by manipulating the customs duties.

14        83.    As J.C. explained, J.C. and Toni Lee sometimes met with Kenny Chan, David Chan, and

15    Donner regarding pricing.  Donner then would continue to meet with the Chans, but privately, outside

16    the presence of other Barco employees.  Donner emerged from those meetings announcing that "We're

17    keeping this specific brand with NGD, and here's how it works. … The only way to get it done is to—is

18    to alter the duty cost."

19        84.    In some situations where Barco had won business based on bids from non-Chan

20    manufacturers, Donner sought to direct some of the business to the Defendant Chan Companies.  For

21    example, in November 2014, employee D.K. of the Defendant Chan Companies wrote to Barco

22    employee S.L., from an Able Allied email address, to ask about certain uniforms for two fast food

23    chains, for which the Defendant Chan Companies had submitted bids.  Even though Barco had already

24    won the business pursuant to other suppliers' bids, S.L. replied to D.K. promising to resend the technical

25    specifications for those uniforms so that the Defendant Chan Companies could "relook at the prices,"

26    noting that "Michael [Donner] feels u [sic] should be a part of this."

27        85.    CBP served summonses on customs brokers regarding transactions between the

28    Defendant Chan Companies and Barco in 2016.  Suspecting that their conduct may be under

COMPLAINT IN INTERVENTION            20

1   investigation, the Defendants undertook efforts to leave Barco's name off the Entry Summaries/Form

2   7501s for some transactions, in an attempt to evade tracking of the relevant imports and transactions.

3        86.     After the United States served Civil Investigative Demands on Barco, the Chans, and

4   certain Defendant Chan Companies in 2018, the Defendants in this Action engaged in further efforts to

5   conceal their conspiracy to fraudulently underpay U.S. customs duties.  Those efforts included, among

6   other things, the Defendant Chan Companies changing the names of their entities several more times.

7   Additionally, Barco and the Chans arranged to more frequently leave Barco's name off the Entry

8   Summaries/Form 7501s, even though (i) the structure of the transactions remained the same, and

9   (ii) Barco was identified on Entry Summaries/Form 7501s involving suppliers other than the Chan

10  companies.

11       87.     Increased scrutiny of customs duties led to a reduction in the amount of business Barco

12  managers awarded to the Chan Companies.  The Chans made numerous pleas to Donner to resume

13  directing business to the Defendant Chan Companies at previous levels.  Donner was sympathetic to

14  these pleas and sent notes from a June 28, 2019, private meeting with the Chans to Barco's CEO and

15  CFO noting "Mega/Able had historically produced 130/140K units per month and now it's down to 30K

16  or so a month. This has obviously hurt them financially."

17       **B.     Barco Directed and Recorded the Fraud Scheme through "Cost Sheets"**

18       88.     The Defendants' conduct in furtherance of their unlawful conspiracy are memorialized in

19  contemporaneous business records that Barco called "cost breakdown sheets," "cost detail sheets," or

20  simply "cost sheets."

21       89.     Barco developed cost sheets to itemize every cost incurred by the Defendant Chan

22  Companies and Barco's other suppliers, including fabric, fabric waste, manufacturer profit,

23  freight/shipping cost, and labor cost.  Thus, for example, the cost sheet for a uniformed chef's coat

24  identified details such as the Barco style number, the size range to be offered, the type of fabric required

25  by the Barco customer (*e.g.*, woven twill, with further numerical descriptors), the various items of trim

26  to be affixed to the uniform (*e.g.*, buttons and restaurant logos), and any embroidery to be added.  The

27  completed cost sheet identified a specific cost associated with each material component (*e.g.*, $4.40 for

28  fabric, $0.46 for the cover button, etc.).

90.     Cost sheets were generally created as spreadsheets in Microsoft Excel format.

91.     Whether duty was included on a cost sheet depended in part on whether the bid Barco received from a manufacturer was to supply apparel on FOB Incoterms or DDP Incoterms.  As outlined in Section VI of this Complaint, above, in an FOB arrangement, the American purchaser assumes the cost of shipping and payment of customs duties.  Because duties represent an additional cost for FOB bids, the cost sheet often listed the customs duty rate and corresponding dollar amount as line items, to help identify the bottom-line cost Barco would incur.

92.     When a purchaser has established DDP Incoterms with a supplier, the vendor agrees to handle freight and customs duties and presents a bundled price to the purchaser.  For DDP shipments, Barco's cost sheet typically did not list out duty rate and corresponding duty amounts owed.  That is consistent with industry practice, given that, with DDP Incoterms, the purchaser generally does not have insight into the customs duties to be handled by the supplier.  With the Defendant Chan Companies, however, Barco regularly listed duty rates and amounts even when the bid was on DDP Incoterms, listing customs duty amounts that were falsely low.

93.     Toni Lee, the former Director of Product Commercialization for Barco and the relator in this Action, created the cost sheet around the time she began working at Barco, in approximately 2011, to better understand and compare suppliers' bids.  She also created the cost sheet with the long-term aim to evaluate whether FOB or DDP incoterms would better benefit Barco.

94.     Donner was enthusiastic about the creation of cost sheets and often asked to review them personally.  He directed that the use of cost sheets become standard operating procedure.  The practice made its way into Barco's employee manual.

95.     When a Barco customer wanted a new uniform or line of products, Barco contacted its suppliers, conveyed the specifications for the product (such as percentage poly blend, shirt style, color, etc.) and asked for a completed cost sheet in return.  Upon receiving each supplier's cost sheet, Barco evaluated the bids, compared prices (sometimes creating their own comparison cost sheet), and negotiated the bids with suppliers.

96.     In addition to Toni Lee, Barco employees A.C., J.L., D.H., and J.R sent cost sheets to the Defendant Chan Companies.  Completed cost sheets were returned by David Chan or D.K., who often

copied Defendant Chan Company employees including Kenny Chan, C.H., and/or T.D.

97.    Once the Barco product and supply team thought they had identified the best bid, they sent the cost sheets to D.M. (Barco's then-Vice President of Sales) to incorporate into a bid to Barco's ultimate customer and to D.A. (Barco's then-CFO) who would determine if Barco would make a sufficient profit.  D.A. often pushed for an even lower bid.  Donner often pushed for a lower bid as well at this stage.

98.    Once the cost sheet was negotiated or re-negotiated, if Barco won the work from its customer, Barco would ultimately award the work to one or sometimes two suppliers.

99.    The cost sheet acted as a price schedule or menu for a specific uniform line, meaning that once Barco and the supplier set the prices for Fast Food Chain 2's uniforms (for example), Barco could order and re-order from the menu for months or years to come.

100.    Barco used the cost sheets with all its suppliers, but, for years, only the cost sheets involving the Defendant Chan Companies reflected falsified duties.  (Later, Barco devised another cost sheet scheme that it employed for all suppliers, discussed further below).

101.    When Barco provided a "blank" cost sheet to a supplier other than the Defendant Chan Companies, Barco typically listed the duty rate and duties applicable to the product.  When the cost sheet was in Microsoft Excel format, the "duty" cell typically contained a simple formula to automatically calculate the customs duties, at the specified rate multiplied by the cell that would contain the full value of the item.

102.    Barco's practices differed for Defendant Chan Companies' cost sheets.  Barco used several methods to encourage the underpayment of customs duties with the Chan companies via the cost sheet.  Most often, Barco coded the Defendant Chan Company cost sheet to allow any amount of duties to be entered— a step in furtherance the Defendants' conspiracy to underpay customs duties.  In other words, on the Defendant Chan Companies' cost sheet, rather than use an automatic formula to calculate duties as with other suppliers, Barco encouraged duties to be a number that lowered the bottom line, irrespective of what was truly due to the United States Government according to the lawful duty rate.

103.    Barco knew the duties were falsely low.  Even if the cost sheets did not indicate a duty rate obviously inconsistent with the duties listed, Barco had imported apparel for decades and was

familiar with duty rates applicable to various types of merchandise manufactured in various foreign countries, the artificially low duties were, or should have been, recognized as patently false on the face of the document. Further, Barco often compared competing bids for the same product from suppliers in the same country, further demonstrating when duties were false.

104.  Other times, Barco backed into and specified the amount of the duties that would need to be declared, based on a total target price that allowed Barco to win or keep the business of its customers.

105.  In doing so, Barco knowingly caused false records or statements to be made or used that were material to obligations to pay customs duties owed to CBP.

106.  The incorrect duties Barco and the Defendant Chan Companies agreed to on the cost sheets were often identical or very close to the fraudulent duties later declared on the Entry Summaries/Form 7501s.  Despite any minor differences from the amount of duties fraudulently declared, the cost sheets reflect a meeting of the minds between Barco and the Chans and the Chan companies to defraud the United States.

107.  Because Barco evaluated competing bids for specific product lines, the duty rate was the same when the item was manufactured in the same country. For example, a 100% Polyester blend polo shirt from the PRC has one rate in the Harmonized Tariff Schedule, thereby making comparison easier if suppliers for that product were both from the PRC.

108.  To make comparing bids easier, Barco would sometimes combine the cost sheets into a single document so different companies' bids could be compared side-by-side within the same document.

109.  For example, the image below shows Barco comparing a bid to supply a shirt for Fast Food Chain 1 from one of the Defendant Chan Companies (NGD) against a bid to supply the shirt from a non-Chan company, Supplier 1.  The cost sheet contained columns for regular size and extra-large size, for each NGD and Supplier 1.  The cost sheet recognized that the same duty rate (32.47%) applied to each item, from each potential supplier.  The two columns for Supplier 1 calculate the duties properly by applying the 32.47% duty rate to the "total vendor cost" (in green), resulting in "duty" line amounts of $███ and $███ per item for Supplier 1 apparel.  By contrast, although NGD's "total vendor cost" entries are very similar to Supplier 1's costs (in fact, slightly higher), NGD's "duty" amounts are far

less—much less than is required by a 32.47% duty rate.  The NGD columns grossly undercalculate the

dollar amount of duties, by almost 50%.

110.    Barco's cost sheets tracked and documented how the Chan Defendants provided Barco

with the lowest price by way of fraudulently underpaying customs duties.  In this cost sheet, Barco

memorialized that it saved $███ for each regular size shirt and $███ for each extra-large shirt by

awarding the business to the Defendant Cham Company (NGD) and knowingly underpaying customs

duties owed to CBP in those same amounts.

| STYLE# WN302B (MALE CREW) | | | | |
|---|---|---|---|---|
| GARMENT COO | Indonesia | China | | |
| FBC COO (100% POLY FLAT MESH) | China | China | | |
| | [Supplier 1] ████ | | [Supplier 1] ████ | |
| | /REGULAR SIZE FOB | R :DDP (A.A) / NGD | X SIZE FOB | X :DDP (A.A) / NGD |
| $ FBC /YD | | ██ | | ██ |
| YEILD | | ██ | | ██ |
| FBC COST $ | | $ ██ | | $ ██ |
| TRIM COST$ | | $ ██ | | $ ██ |
| STANDARD SAM | | ██ | | ██ |
| PRODUCTIVITY AGAINST STANDARD | | ██ | | ██ |
| ADDITONAL SAM | | ██ | | ██ |
| ACTUAL SAM | | ██ | | ██ |
| FULLY LOADED LABOR/HR | | ██ | | ██ |
| LABOR COST $ | | $ ██ | | $ ██ |
| Mfg. OH (% of Labor cost) | | ██ | | ██ |
| Mfg. OH | | $ ██ | | $ ██ |
| SGA  (% of Labor cost) | | ██ | | ██ |
| SGA COST $ | | $ ██ | | $ ██ |
| EMBROIDERY  COST $ | | $ ██ | | $ ██ |
| TOTAL CMT COST$ | | $ ██ | | $ ██ |
| SECONDS(DEFECTS) % | | ██ | | ██ |
| ADDITIONAL SECONDS$ | | ██ | | ██ |
| MFG PROFIT % | | ██ | | ██ |
| MFG PROFIT$ | | ██ | | ██ |
| TOTAL VENDOR COST $ | $ ██ | $ ██ | $ ██ | $ ██ |
| DUTY (32. 47%) | $ | $ ██ | $ | $ ██ |
| FREIGHT TO USA | $ | $ ██ | $ | $ ██ |
| SALES TAX 4.5% | | $ ██ | | $ ██ |
| TOTAL LANDED COST | $ ██ | $ ██ | $ ██ | $ ██ |
| VARIANCE | | $ | | $ |

111.    Presented with this cost sheet during testimony under oath during the investigation of this

matter, former Barco VP of Supply Chain J.C. explained that the Barco would specify a target price that

Barco would need to meet to win or keep the business.  As for this example, he stated "it looks like we

knew we needed to get to $■■ for the total landed cost in order to make money on the [Fast Food Chain 1] program." According to J.C., Barco was "sending the information to NGD saying, 'Guys, this is what you need to put down for duties.'" In other words, Barco backed into the duties that would need to be declared (■■■■) to arrive at a $■■ bottom-line cost and communicated that to the Defendant Chan Companies (here NGD).

112.    J.C. generally preferred Supplier 1 over the Defendant Chan Companies. But he testified it was generally not possible to get to the target price without altering duties, which troubled J.C. J.C. explained that "Donner would always be the one that would instruct us on what we needed to do [to alter the duty]. … [T]his was part of the distrust that I had for him to the nth degree."

113.    Exhibit 3 provides an example of Barco soliciting the Chans to knowingly underpay duties by sending cost sheets prepopulated with target costs, including specific targets for the fraudulent duties. Exhibit 3 (from which the two images below have been excerpted) shows Barco's collection of cost sheets for uniform items bid to Fast Food Chain 2 in September 2014. This compilation of cost sheets compares bids for multiple types of shirts and pants, submitted to Barco by Defendant Chan Company Able Allied, Supplier 2, and Supplier 3. For each uniform item, there is a column titled "Barco Target," containing Barco's goal for the cost of that item, which is broken down by Barco's goal for each component of the total cost, including Barco's target for the customs duties. The column to the



| FBC (CHINA): ■■■ / CW 57" | | | |
| COO: INDONESIA | Barco Target | [Supplier 2] | Variance |
| YIELD: | ■■■■ | | 0 |
| FABRIC: | $ | $ | $    - |
| TRIM: | $ | $ | $    - |
| CM: | $ | $ | $    - |
| TOTAL FOB VENDOR COST: | $ | $ | $    - |
| DUTY: 25.9% | $ | $ | $    - |
| FREIGHT: | $ | $ | $    - |
| TOTAL LANDED COST: | $ | $ | $    - |

right of "Barco Target" is the actual cost that Able Allied or Supplier 2 and 3, respectively, offered in its

bid for that line item.

114.    For the cost sheets applicable to Supplier 2 in Exhibit 3, the duties listed are an accurate reflection of the stated duty rate multiplied by the aggregate cost of the item. For example, on page one (and excerpted below), the duty listed is 25.9%, the Total Vendor Cost is $██, and Barco's target for duties is $██, which is about 25.9% of ██.

115.    Conversely, as an example for Defendant Chan Company Able Allied, on page two of Exhibit 3, the same duty rate applies (25.9%), and Barco's target for the total vendor cost adds up to $██.[3] Even though 25.9% of $██ is about $██, Barco itself prepopulated the target duty cost as $██—*i.e.*, less than half of what customs duties should be. As shown by the "Able Allied" column, Able Allied accepted that prepopulated duties of $██. It did so even though Able Allied's bid was slightly higher than Barco's target for the total cost of the item, exacerbating the degree to which duties were knowingly underpaid.



| ██471 (MALE) | | | |
|---|---|---|---|
| COO: CHINA | Barco Target | Able Allied | Variance |
| YIELD: | ███ | ███ | ███ |
| FABRIC: | $ | $ | $ |
| TRIM: | $ | $ | $ |
| CM: | $ | $ | $ |
| FREIGHT(MATERIAL): | $ | $ | $ |
| VENDOR PROFIT: | $ | $ | $ |
| DUTY: 25.9% | $ | $ | $ |
| FREIGHT TO BARCO: | $ | $ | $ |
| TOTAL DDP | $ | $ | $ |

116.    Indeed, Exhibit 3 shows that Able Allied accepted Barco's target duties for every item. That is the case regardless of whether Able Allied met Barco's target total cost for the item or Able Allied's bid exceeded the total target cost for the item. The duty listed for Supplier 2, in contrast,

---

[3] Note that "Yield" is a statement of the amount of fabric in yards that is required to make each item and is not a component of the cost calculation.

accurately reflects the duties owed.

117.    Exhibit 3 demonstrates Barco knowingly causing false records or statements to be made or used that were material to obligations to pay customs duties owed to CBP.  Exhibit 3 further demonstrates  Barco conspiring with Able Allied (as controlled by Kenny Chan and David Chan) to improperly avoid or decrease an obligation to pay customs duties to CBP.

118.    Sometimes, such as in the 2013 example below,[4] Barco asked the Defendant Chan Companies to fill out cost sheets that sought both DDP and FOB Incoterms pricing.  These cost sheets also reveal fraud.  Specifically, the Defendant Chan Companies provided two different FOB prices: (1) one called "Custom FOB" that memorialized a falsely low FOB price and (2) a second, higher FOB price called "FOB (For Barco)" that more accurately reflected the price that Barco would pay if FOB Incoterms were selected.  The Excel formulas embedded in the original document reveal that the "Custom FOB" price impermissibly deducted costs that are properly dutiable—namely, overhead, PRC tax, and the Defendant Chan Companies' profit.  *See* 19 U.S.C. § 1401a(b) *supra*, ¶ 45.



---

[4] Red highlighting and the equation at the bottom ████████████████████ added to this figure for illustrative purposes.

119.    The math in this spreadsheet shows how Barco received the benefit of the fraudulent duties.  The Defendant Chan Companies' DDP price (⬛ in this example) is what Barco actually paid, and was calculated by starting with the "FOB (For Barco)" price ($⬛), which is the Chans' actual underlying price for the item.  To create the DDP price (that Barco would pay), the cost sheet adds the shipping cost and an amount for duty to the actual price of the item (*i.e.*, to the "FOB (For Barco)" price).  But, the duty rate was applied to the falsified, lower price ("Custom FOB"), not the real price.  Thus, the DDP price that Barco paid to the Defendant Chan Companies was lower than it would have been if the appropriate duty had been applied.



120.    As another example of price manipulation, in November 2014, in a negotiation over line items in the cost sheet the Chans provided, Chan employee D.K. (from an Able Allied email address) replied to Toni Lee at Barco (copying Kenny Chan at a J&K Garment email address, plus Barco employees A.C. and S.L.) noting first that, "You forgot to calculate the duty for the extra fabric cost being added which is $⬛ x [the customs duty rate of] 32.5% = ⬛."  Then D.K. made clear, "You can see from the cost breakdown sheet we only added $⬛…" In other words, the duties owed were ⬛ cents for the product, but the Chan company bid to Barco reflected a plan to pay only ⬛ cents per item—reducing the amount of customs duties owed to CBP by over 40%.

121.    D.K. explained that the cost could not go lower because "We can't declare the value too low or we will get into trouble.  Hope it is clear to you now."  Barco and the Defendant Chan Companies knew that declaring a value too low would raise a red flag for CBP.  They conspired for the

1    Defendant Chan Companies to declare to CBP a merchandise value low enough to give Barco a

2    significant cost-savings, but not so low as to risk drawing scrutiny from CBP.  This conspiracy with

3    Barco to fraudulently underpay duties owed to CBP is the reason why the Defendant Chan Companies

4    were a top supplier to Barco and is how Barco could offer its customers lower prices and consistently

5    win business.

6        122.    In 2018, during the Government's investigation, Barco engaged a third-party auditor to

7    review its accounting records.  On the topic of imports and customs duties, the auditor recommended

8    that "Duty calculations should be double-checked before final DDP price is agreed with vendor…,"

9    citing the legal ramifications for Barco associated with underpayment of duties, in apparent reference to

10   customs duties that were not supported by transactional documents.

11       123.    To make it appear as though Barco was implementing the advice of the auditor, Barco

12   redesigned its cost sheets to automatically calculate duty as a mathematical formula related to the value

13   of the item, and to lock down the customs duty cell to prevent suppliers from overriding the cell to input

14   any duty amount.

15       124.    But the cost sheets that Barco redesigned merely refined the scheme rather than eliminate

16   it.  The redesigned cost sheets improperly excluded vendor profit from the calculations of item value

17   subject to customs duties, as part of calculating an "FOB for Barco" price.  As explained above, vendor

18   profit is subject to customs duties.  As a method of fraud, excluding only vendor profit from the

19   calculation of customs duties would result in duties that were closer to accurate than what had been paid

20   on the Defendant Chan Companies' apparel up until that time, but nonetheless still underpaid duties.

21       125.    Barco soon thereafter required all vendors, including vendors not affiliated with the

22   Chans, to use the new cost sheet.  Barco employed the "FOB for Barco" method as part of their vendor

23   manual.  As it applied to all vendors, the redesigned cost sheet encouraged, and impliedly directed, all

24   vendors to underpay duties.

25       126.    The Defendant Chan Companies were perplexed by the new cost sheet because they

26   knew the conspiracy to underpay customs duties was a lynchpin of the business relationship between the

27   Defendant Chan Companies and Barco, and they expected the conspiracy to continue in its then-current

28   form.  On November 21, 2018, when Barco provided the Defendant Chan Companies with the new cost

sheet design, D.K. replied:

> Hey [A.C.],
>
> What is the purpose for an updated cost sheet in the new template **as our price is not going to change?** Furthermore, by using this new template the DDP will going up [sic] it is because the FOB on the new cost sheet is not reflect to FOB which factory export the products then **the duty will be higher than what was on existing cost sheet. It is because factory takes out their profit, domestic sales tax, Mega profit etc to declare the FOB as to provide lower duty which is benefit to Barco**. Pls advise. …

(emphasis added).

127.    In this email, D.K. memorialized the Defendant Chan Companies' understanding that the conspiracy to undervalue imported merchandise and underpay customs duties would continue—*i.e.* "our price is not going to change," whether the prices excluded a host of price components (also excluding domestic sales tax and profit, in addition to vendor profit) or the falsely low duties would be specified in the cost sheets, regardless of the duty rate.  But if Barco was seeking to perpetrate a more modest fraud, by excluding fewer components from the calculation of duties, D.K. was seeking to confirm that Barco knew the price would go up.

128.    Soon thereafter, D.K. followed up with an example to illustrate his point, by explaining that for item number ███401 (a specific uniform piece), the price would increase by $1.09 as compared to the previous cost sheet for that item.  He then stated, "I don't think this is what you want but this is how the price is coming out from the new cost sheet."  He attached the old cost sheet where duty could be manually entered, *i.e.* manipulated, and the new cost sheet which, though it still improperly excluded several categories, it was nevertheless more expensive than the Defendant Chan Companies' bid under the prior cost sheet.

129.    Upon receiving D.K.'s email that the new cost sheet increased costs, Barco employee A.C. forwarded to Barco management who forwarded to other members of the executive team and stated "Please see below. We need to discuss…"

130.    Barco used the cost sheets to further its conspiracy with the Chan Defendants to fraudulently underpay customs duties in various ways—by providing a "target price" that allowed the

Defendant Chan Companies to back into a calculation of duties to achieve a pre-determined price, making the duty field blank, by creating the "custom FOB" price that excluded properly dutiable costs, and discussing via email how low duties could go before one could get in trouble with CBP.  The cost sheets are evidence of Barco's and the Chan Defendants' meeting of the minds to knowingly and improperly underpay duties owed to the United States.  The fraudulently low duties bid on the cost sheet were equal to or approximately equal to the fraudulently declared duties on the Entry Summaries/Form 7501s.

### C.    The Double Invoicing Scheme

131.    For each of their improper transactions with Barco, the Defendant Chan Companies created two invoices.  One genuine invoice, between a Chan company and Barco, that represented the real price that Barco agreed to pay to the Chan company ("real invoice").  The real invoice was not submitted to CBP or the customs broker that submitted the Entry Summary/Form 7501 to CBP.

132.    A second invoice conveyed a fake price for the same items (the "fake invoice"), which attempted to justify the artificially low duties.  The fake invoices purported to show that the items were purchased at a significantly lower price than the price actually agreed upon.  The fake invoices also often falsified the entity that manufactured the goods and to whom the items were purportedly sold.  To achieve the false duties line item bid on the cost sheet, the parties needed to falsify the value of the goods imported (thereby supporting the false duties amount).  The fake invoices did precisely that.

133.    The fake invoices were used to provide plausible (albeit fraudulent) support for the Entry Summary/Form 7501 regarding declarations of the items imported and the value of those items.  For each transaction, Defendant Chan Companies submitted the fake invoice to a customs broker or other agent, who relied upon the information appearing on the fake invoice—including the number of items, type of item, and the total amount "paid" for those items—and reported it to CBP as part of the Entry Summary/Form 7501.

134.    Presenting, or causing to be presented, the fraudulent Entry Summary/Form 7501 to CBP which parroted information from the fake invoice provided the fraudulent basis on which duties were levied.  Because that value and basis were fraudulent, the duties levied were improperly low. Defendants knowingly and improperly withheld the proper amount of duties owed.

135.    The Defendant Chan Companies did not advise customs brokers that the fake invoices were fake or that the information was inaccurate.  Nor did Barco.  As agents to the Defendant Chan Companies, the customs brokers then incorrectly certified the information as truthful in the submission of Entry Summaries/Form 7501s to CBP.

136.    Most often, the "transaction" on the fake invoice was between two Defendant Chan Companies, between a Defendant Chan Company and another other interchangeable company owned or operated by the Chans, or between two other interchangeable companies owned or operated by the Chans.  *See, e.g.*, Ex. 4. As these companies were just different names for the same business operation, the fake invoice did not reflect any real transaction.

137.    Common names that were used on the fake invoices included each of the Defendant Chan Companies, plus other Chan entity names including, but not limited to, Suzhou Y&D Garment, Shanghai East Best Arts and Crafts, Suzhou Y&D Garment Co., Huianan Y&D Garment Co., Shanghai Grandsun Imp. & Exp., and UnityinLuv (also spelled Unity inLov).  Often, this entity would be shown as "selling" the items to one of Superway Import and Export, Able Allied, NGD, or Mega Goodwill (each of which is a Defendant Chan Company).

138.    Sometimes the Defendant Chan Company purportedly "purchasing" the apparel, according to the fake invoice, would then appear on the real invoice as selling the apparel to Barco.  (For example, various fake invoices showing purported transactions between Shanghai East Best Arts and Crafts, which is a company operated by the Chans, and Able Allied, correspond to real invoices showing transactions between Able Allied and Barco.)  Other times, the entities identified in the fake invoice did not appear on the corresponding real invoice, showing that the Defendants in this Action struggled to keep track of the fungible Chan company names being used on the fake invoice used to support the underpayment of customs duties.

139.    Other times, still, the fake invoices were addressed to no one or were addressed to Barco.  *See* Ex. 5.

140.    Prior to 2016 when the Defendants first suspected that they may be under investigation, Barco sometimes appeared as the consignee on the Entry Summary/Form 7501, consistent with the fact that Barco was the American purchaser causing the apparel to be imported.  After 2016, the Entry

Summaries/Form 7501s less frequently listed Barco and often only listed other Chan entities appearing on the fake invoice. (Later, the parties added another layer of concealment to the fraud by using different names for the importer of record and consignee as compared to what appeared on the fake invoice, as discussed further below.)

141.    The Defendant Chan Companies emailed the real invoice directly to Barco. The real invoice referenced the Barco purchase orders it fulfilled. *See* Exs. 6-A, 7-B, 8-B.

142.    Barco paid the Chan companies based on the real invoice by wiring money to the Chan companies' account in the PRC after the goods were received.

143.    Barco knew about the fake invoices. It even sometimes maintained them in its files related to receiving shipments.

144.    Once manufactured in the PRC, Chan companies' in-house quality control approved the items, Barco quality control personnel in the PRC approved the items, and the Chans packaged the uniforms into Barco-branded boxes and shipped them directly from their factory in the PRC to Barco's warehouse in California. The items generally bared a logo of Barco's customer and a clothing label tag with Barco's name and logo on it, before being packaged in cardboard boxes with Barco's logo and motto ("Made to Matter"). In other words, the Chan Defendants created the uniforms directly for Barco and its customers. The apparel could not be used or purchased by other parties who lacked authority to sell the trademarked merchandise.

145.    As soon as the items left the Chan factory, a Chan company representative (usually David Chan or D.K.), emailed Barco to convey the shipping information including ship date, estimated arrival, tracking number or shipping container number, and attached a "packing list" that inventoried the items packed into boxes scheduled to arrive at Barco.

146.    This "shipment notification email" sometimes attached an invoice for payment to Barco (real invoice) and sometimes the Chan companies sent the real invoice separately.

147.    When the shipment from the Chan companies arrived at Barco, a Barco employee (often the Director of Product Commercialization, or the Director of Quality Inspection, or others in their purview) opened each container, ensured the promised items arrived by checking them off one-by-one, and confirmed the product counts and styles against expectations. The Barco employees created a

"shipping packet" that included the purchase orders Barco sent the Chans, a system "Receiving Report" print out, a document from the broker or third-party logistics company that reflected shipper and delivery address, sometimes the fake invoice, and sometimes the Entry Summary/Form 7501.

148.    To this shipping packet, Barco would later add the Chan's real invoice and proof of wire payment to the Chan company in the PRC.

**D.    Additional Examples of the Conspiracy and Fraud**

1.    **Example 1: Fake Invoice and Falsified Entry Document**

149.    The following provides a specific example to illustrate the scheme and the false representations to CBP.  This example is representative of hundreds of import transactions that Defendants have misrepresented to brokers and CBP during the scheme.

- In January 2014, Barco purchased ▮▮▮ ladies' woven shirts (HTS code 6206.40.3030) from the Chan Defendants for $▮▮▮▮▮.  This transaction was documented by a real invoice between Barco and Defendant Chan Company NGD dated January 15, 2014.  *See* Ex. 6-A (see PO# 3800800-122 and PO# 3905100-01).  Barco ordered these shirts for sale to two Barco customers, which were American fast-food chains.  The shirts were not suited for sale to other parties within the United States.  As indicated by the real invoice between Barco and NGD, the purchase occurred on DDP terms, meaning that NGD was financially responsible for delivering the shirts to Barco, after entering the shirts at an American port of entry.

- On January 21, 2014, NGD filed an Entry Summary/Form 7501 through a customs broker reflecting the import of garments that the Chan Company Defendants manufactured for sale to Barco.  *See* Ex. 6-B.  Specifically, through the customs agent, NGD declared that ▮▮▮ dozen) ladies' woven shirts (HTS code 6206.40.3030), among other items, were being imported.  However, that Entry Summary/Form 7501 fraudulently declared the total transaction value of those ▮▮▮ shirts to be ▮▮▮, instead of truthfully declaring Barco's actual purchase price of ▮▮▮▮.  *See* Ex. 6-B, at Line 001.  Based on the 26.9% duty rate applicable to items classified by HTS code 6206.40.3030, the duties on the import of those items were assessed as $▮▮▮.  These

duties are much lower than they should have been because the transaction value was substantially understated.  Since the actual amount paid for those items was $███████, the customs duties should have been more than $████.  But only $██████ in duties were declared and paid to the United States—substantially less than owed.

- Further, the Entry Summary listed NGD as the importer of record.  Notably, by arrangement between Barco and the Defendant Chan Companies, NGD was also listed as the ultimate consignee in this Entry Summary/Form 7501, even though the shirts were being consigned to Barco, to limit detection of Barco's role in the scheme.

- The customs broker entered false transaction values in the Entry Summary/Form 7501 based on a fake invoice purporting to show that NGD purchased the same number (████) of ladies' woven shirts for the same price ($███) from Shanghai East Best Arts & Crafts Co.  *See* <u>Ex. 6-B</u>.[5]  However, Shanghai East Best Arts & Crafts Co. is operated by Kenny and Danny Chan and is indistinguishable from NGD.  This fake invoice did not reflect any real transaction between these identical corporate parties.

2.    **Example 2: Falsified Cost Sheet and Entry Document**

150.    Another example of Defendants' fraud is Barco's purchases January of Chef Coats from Chan Defendant Able Allied Limited in late 2016.  Barco's cost sheet for Unisex Chef Coat, Barco style ██401 (HTS code 6206.40.3030, HTS classification Women's Blouses), for use by an American restaurant chain, falsely listed duty as $███ cents per item.  *See* <u>Ex. 7-A</u>.  (This was the same cost sheet cited by Chan employee D.K., as described in ¶ 128).

- This cost sheet showed a price to Barco of $███ per item (plus $███ freight), which consisted of $███ for fabric, $███ trim, $███ for embroidery, $███ labor, $███ manufacturer profit, and $███ customs duties (equating to a falsely low duty rate of approximately 11%, or 9.7% of the bundled DDP cost).  The duties of $███ cents per item was manually input into the spreadsheet and not calculated using a formula applying

---

[5] The real invoice is known to involve the same transaction the fake invoice based on matching quantities of the items (2,071), as well as the shipping container number appearing on the Entry Summary/7501 and a shipping notification emailed from the Chan Company Defendants that also attached the real invoice.

the duty rate to the value of the item.  Based on its decades of industry experience and close attention to each component of its suppliers' prices, Barco knew that amount was artificially low.

- The total price of $███ per item was consistent with the amount Barco paid to Chan Defendant Able Allied Limited, based on the real invoice showing ████ owed on ███ items (invoice number 1418, dated January 6, 2017).  *See* Ex. 7-B (PO #7338600-01).

- The lawful duty rate for this type of product is 26.9% of the transaction value.  The Entry Summary/Form 7501 information submitted to CBP in connection with this shipment (entry date December 26, 2016) identified that duty rate.  *See* Ex.7-C, at Line No. 004.  But, to falsely reduce the total amount of customs duties owed, the Entry Summary/Form 7501 falsely declared a transaction value of only $███ per piece for these ████ items (███ dozen), for a total price of only $████.

- The customs broker entered this information in the Entry Summary/Form 7501 based on a fake invoice between Chan entity Shanghai Grandsun Imp. & Exp. Co., Ltd., and Chan entity Huainan Y&D Garment Co., Ltd. (which are indistinguishable corporate entities operated by Kenny and David Chan), showing that price.  *See* Ex. 7-D.  The fake invoice did not list the Able Allied which was listed on the real invoice to Barco.

- Based on this false transaction value, the Entry Summary/Form 7501 declared $████ in payable duties attributable to these items, when the actual duties should have been more than $████.

3.    **Examples 3 & 4: Falsified Cost Sheets and Entry Document**

151.    Another example of Defendants' fraud was Barco's November 2018 purchase of shirts from Chan Defendant Able Allied Limited.  The cost sheet associated with this transaction, for Male Manager SS Dobby Shirt, Barco style ███ 102B (HTS code 6205.30.2030, HTS classification Men's Dress Shirts), for use by an American fast-food chain, falsely listed the duty as $0.79 per item.  *See* Ex. 8-A.  Similarly, Barco's cost sheet for a similar product with a different style number—Male Manager SS Dobby Shirt, Barco style ███ 102XB (HTS code 6205.30.2030, HTS classification Men's Dress

Shirts)—also falsely listed the duty as $███ per item.  *Id*.

- The ███ 102B cost sheet showed a price to Barco of $███ per item (plus $███ freight), which consisted of $███ for fabric, $███ trim, $███ for art/wash, $███ labor, $███ manufacturer profit, , and $███ customs duty (equating to a 13.8% duty rate, or 11.8% of the bundled DDP cost).  The ███ 102XB cost sheet showed a price to Barco of $███ per item (plus $███ freight), which consisted of $███ for fabric, and was otherwise the same as the cost sheet for ███ 102B, including the same $███ customs duties (equating to a duty rate of approximately 12%, or 10.5% of the bundled DDP cost, for ███ 102XB).  In each case, the duties of $███ cents per item were manually input into the spreadsheet and not calculated using a formula applying the duty rate to the value of the item.  Based on years of industry experience and close attention to each component of its price, Barco knew that duty rate and amount were inaccurate.

- The total price of $███ per item was consistent with the amount Barco paid to Chan Defendant Mega Goodwill, based on a real invoice (number 70, dated November 8, 2015).  *See* <u>Ex. 8-B</u>.

- The lawful duty rate for this type of product is 25.9% of the transaction value plus $███ per kilogram in weight-based duty.  The Entry Summary/Form 7501 submitted to CBP in connection with this shipment (entry date October 29, 2018) identified that duty rate.  *See* <u>Ex. 8-C</u> at Line No. 002.  But, to falsely reduce the total customs duties owed, the Entry Summary/Form 7501 falsely declared a transaction value of only $███ per piece.  The Entry Summary/Form 7501 was supported by a fake invoice between Chan entity Shanghai Grandsun Imp. & Exp. Co., Ltd., and Mega Goodwill (which are indistinguishable corporate entities operated by Kenny and David Chan), purporting to show that price.  *See* <u>Ex. 8-D</u>.  Based on this false transaction value, the Entry Summary/Form 7501 declared $███ in payable duties attributable to these items, when the actual duties should have been more than $███.

- The Entry Summary/Form 7501 identified the importer of record as Mega Goodwill and ultimate consignee as a third-party warehousing logistics company.  Even

though Barco had ordered the items directly from the Chan companies and would then resell the items to an American fast-food chain, to limit detection of Barco's involvement in the scheme, the Entry Summary/Form 7501 did not list Barco at all.

### E.    Defendants Concealed the Scheme and Attempted to Evade Detection

#### 1.    The Chans Used Evolving Entity Names to Avoid Scrutiny

152.    Though Kenny and David Chan constantly changed the public-facing names of the companies, their operations and the scheme remained the same.

153.    One of the reasons for the constant evolution of names was to evade CBP detection.

154.    The Chan Defendants knew that CBP monitored imports and exports by tracking the name of the shipper and seller.  Slight alterations in this name such as changing "JK Garment Co." to "New JK Garment Co." and then to "New J&K Garment Co." would prevent CBP's system from effectively track these entries.

155.    In their direct communications with each other and in internal communications, Barco and the Chans made no attempt to pretend that the Chan entities were distinct companies, and Barco knew they were not.  Names, information, and representatives (who rarely changed when an entity's name changed) are memorialized on third-party audit paperwork and copied on emails between Barco and the Chans.

156.    Barco's own internal files show that Barco tracked and considered the Chan Companies to be one entity for every purpose, and even Barco had difficulty following the changing names of the Chans' entities over the years.  For example, Barco completed a "Facility and Merchandise Authorization" for one of their customers and listed a manufacturing facility name "Huaian Y&D Garment Co" with a contact of T.D. at a J&K Garment email address.  A Barco employee appended a document that listed "Nathan Global Direct/Suzhous J&K Garment" and contacts with "@jk-garment.com" email addresses, three manufacturing facilities, and then added the below handwritten

note, attempting to trace the use of various Chan company names over the years:



157.     When Barco ran accounting reports on vendors, it included all of the Chan company

entities in the same report.  Barco executives knew this, and the CFO directed it.  In fact, in one email

communication among Barco employees dated October 5, 2018, the CFO stated: "These are all the same

vendor-different names- Mega Goodwill, Able, NGD."



158.     Barco made representations about the ownership of companies like J&K and J&S

Garment to third-party auditors.  For example, when the Chans opened a new factory using the name

Guannan J&S Garment, Barco's VP of Supply Chain, J.C., emailed a third-party auditor, Intertek, to

arrange an inspection and emphasized that the new factory "is fully owned by the same family

ownership" as J&K.

159.    Barco also made representations about ownership of the Chan companies to CBP.  For example, in June 2013, when CBP stopped and inspected a container which it discovered contained trademarked/licensed merchandise.  CBP declined to release the container until it confirmed that the shipper had authority to possess Fast Food Chain 3's trademarked apparel.  A Barco executive submitted a letter to CBP stating NGD was an authorized supplier and was permitted to import from New J&K Garment.

160.    In 2014, Barco Uniforms joined CBP's program known as "Customs Trade Partnership Against Terrorism" (CTPAT), which is a partnership between a company and CBP wherein the member (here, Barco) makes certain representations and agreements to "protect the supply chain, identify security gaps, and implement specific security measures and practices."  Barco represented insight into and control over its supply chain, from each factory floor to Barco's warehouse in California.  In exchange for representations about the supply chain (including vendors/suppliers), the member benefits include "reduced number of CBP examinations," "shorter wait times at the border," "possible exemption from" certain examinations, and many others.

161.    For example, Barco represented to CBP that its suppliers were required to fill out a supply chain security agreement that details information such as name, location, and security protocols. The Chan company, Defendant Able Allied, completed it and identified itself as "Huaian Y&D Garment Co. Ltd…. China" and had Chan employee T.D. with a "@ydgarment" email address listed as the contact. In summary, Barco represented insight into and control over its supply chain, from each factory floor to Barco's warehouse in California.

162.    The common thread in these representations to CBP, third-party auditors, and customers as part of social/compliance audits, was that Barco knew all of the Chan entities were owned and controlled by the Chans and were functionally interchangeable.

163.    The Chans regularly co-mingled the names, addresses, and email addresses of their companies, including in its company profile that listed J&K as equivalent to Nathan Global (USA) and Suzhou J&K (China).  In emails to Barco, Kenny Chan, David Chan, and other Chan company representatives would often use one domain name email address from one company, such as @jk-

garment.com, but use a signature block that represented a different company or companies like "Nathan Global Direct" and/or "Suzhou J&K" and the email would copy other Chan personnel at different email domains like @ydgarment.com.  Those emails often discussed the Chans' business as a unified operation, such as "our factory" making a shipment to Barco.

164.     As another example, when Nathan Global Direct became Able Allied, David Chan corresponded using both addresses, sometimes in the same email chain.  Sometimes he copied the quality control employee, F.L. who still used a @jk-garment email domain. Some, including Kenny Chan, later adopted @ydgarment domain address which matches the facility paperwork filed elsewhere calling the factory Huaian Y&D.  David Chan and D.K. also often used an @ableallied email domain. Regardless of the domain names used, as Barco's Vice President of Supply Chain said to an auditor, it was "the same family ownership."

165.     While working on a specific product or bid or delivery, Barco often directly emailed and corresponded with the Chan representatives at the factory who used @jk-garment and @ydgarment domain names.

166.     Later in 2014, Nathan Global Direct (NGD) became Able Allied.  This Chan company was registered in the British Virgin Islands.

167.     In 2016, the CBP issued summons to produce documents to Barco and brokers for transactions involving the Chan companies.

168.     In 2018, the Government issued and served Civil Investigative Demands on Barco Uniforms and the Chan companies, serving David Chan who was the registered agent for NGD.  Shortly after being served, David Chan left the United States for Hong Kong and did not return. Kenny Chan also refrained from his regular visits until 2024.

169.     Later in 2018, the Chan business became Mega Goodwill.  This company was also registered in the British Virgin Islands with associated addresses in Hong Kong. Chan employee D.K. emailed shipment notifications for "Able" shipments in the same email chain as Mega Goodwill Shipments.

### 2.     Barco's Active Concealment and Evasion of Scrutiny

170.     Before the United States began investigating Barco and the Chan companies, Barco was

often listed on the Entry Summary/Form 7501 as either the importer of record or the ultimate consignee in the Chan transactions. In the earlier years of the relevant period in this Action (approximately 2012 to 2016), Barco was sometimes the importer of record and often the ultimate consignee.

171.    After the Government served a Civil Investigative Demand on Barco in 2018, Barco disappeared almost entirely from the Entry Summaries/Form 7501s in that year. Nothing changed about the transaction between Barco and the Chan companies, except the names listed on the CBP paperwork. Barco was still "qualified to be importer of record" under the law. Barco also should have been listed as the ultimate consignee because (i) Barco caused the entry into the United States by issuing purchase orders to the Chans, and (ii) Barco was always the ultimate intended destination in the United States—as evidenced by the uniforms bearing Barco's tag and shipment notifications the Defendant Chan companies sent Barco, with container numbers and other details so Barco could track and receive the shipments, each time the goods left the factory in the PRC.

172.    In 2018, Barco contacted the Chan companies to ensure that the Chan companies were not listing Barco on the Entry Summary/Form 7501. Chan company employee D.K. explained that Barco was the consignee on many Entry Summaries/Form 7501s because the shipment went to Barco and the broker instructed this was the proper procedure. Later, the Entry Summaries/Form 7501s began listing a third-party logistics company as ultimate consignee in order to drop Barco from the Entry Summary/Form 7501. Importantly, whatever company ended up on the Entry Summary/Form 7501 the transaction and delivery were always the same and the scheme remained unchanged.

173.    In On April 19, 2018, a Barco employee sought advice on how to handle certain payments and explained that Defendant Able Allied Limited could wire Barco, but "I thought we were trying to stay away from payments directly from Able?"

174.    In 2019, Donner sent a letter to suppliers stating that Barco was undergoing an audit and asking the supplier to represent that all customs duties had been properly paid by returning a countersigned letter.

175.    Also in 2019, Donner made it a priority project for Barco to amend its existing supplier agreement to foist all risk and responsibility of paying duties onto suppliers and planned to make the agreement retroactive to 2018 to relieve Barco of any responsibility for previously underpaid duties.

### 3. 2021: The Scheme Continues and a New Entity Emerges

176. In November 2021, CBP stopped a shipment at the port bound for entry and delivery to Barco's Gardena Warehouse.

177. CBP contacted the parties on the Entry Summary/Form 7501 and sought the purchase orders and "tech packs" underlying the import. "Tech packs" are technical drawings and specifications created to guide manufacturers and tech packs often reveal information such as textile percentage blend which can affect HTS code, *i.e.* applicable duty.

178. An individual residing near Sacramento supplied the "Unity inLov" Purchase Orders.

179. The purchase orders retained the metadata file path printed on the purchase order which revealed that D.K. (Chan company employee) had last saved the document in June of 2021. The metadata also showed the name the document was saved as and ended in ".brco."

180. The purchase order, which looks exactly like Barco's purchase orders, had been doctored to look like a Unity inLov purchase from a company referred to as "Shanghai Hongdun Fashion Co." The fine print, however, betrayed this doctoring as it still had Barco's name in its disclaimers. Other than the accidental inclusions, the purchase order is intended to appear as if Barco is not a party to the transaction.



**PURCHASE ORDER**

Bill To:  UNITY INLOV INC
2301 RAINER AVENUE
ROWLAND HEIGHTS CA 91748
UNITED STATES



| P.O. # | F1115-00 |
|---|---|
| This P.O number and Account Name must appear on all Invoices B/L, Packages, Delivery slips and Correspondence. | |
| DATE: 04/28/21  Page: 1 of 1 | |

Supplier :
Shanghai HongDun Fashion Co.
139 Zhongshi Road, Hangtou Town,
Pudong District, Shanghai 201317,
P.R.China

Terms Point :
Shanghai China



| Terms | | Ship Via | | Season | | ETD Date | Cost Code | Due Date | |
|---|---|---|---|---|---|---|---|---|---|
| NET 7 DAYS | | BEST | | FALL 2020 | | 08/20/21 | FOB | 10/01/21 | |
| Style | Color | | Size Scale | | | | Qty | Price | Total |
| 007P | 23 | YOGA PANT BLACK | | | | DUE 10/01/21 | | | |
| 001-O  BK | | XXS  XS  S  M  L  XL  XXL | 28  14 | | | | 42 | | |

**PRODUCT CATEGORY: YOGA PANT**
ALL CONTRACTORS SHOULD CHECK ALL CUTWORK AND TRIMS RECEIVED PRIOR TO THIS PURCHASE ORDER. ALL TRIMS AND ACCESSORIES NOT RECEIVED WILL BE CHARGED BACK TO YOUR ACCOUNT IF NOT RECEIVED.
Barco's Purchase Order Number, Style/Color code must appear on all invoices, shipping memos, bill of lading receipts and packages. Please confirm receipt of all orders or delivery/quantity changes within (1) week. Please advise of any backorders.

Authorized Signature: _____

| * * * US DOLLARS * * * | TOTAL: | 42 | |
|---|---|---|---|

Packing Slip must accompany all shipments. Please Ship the above order subject to the terms noted hereon.

181. The tech packs here revealed that the garments were a media company's licensed apparel designed to have Barco's name and address on the label. Meaning, Barco had issued purchase orders for those items which were to be delivered directly to their warehouse. Barco's omission from the Entry Summary/Form 7501 and submitted invoices was accomplished by design.

182. As a condition of granting entry for the goods into the United States, CBP required that the party pay higher duties because it was clear from the search of the container and the documents produced that more duties were owed. Also, as a condition for granting entry into the United States, CBP required that the Form 7501 be revised to list Barco as the ultimate consignee because according to the transaction documents CBP reviewed, Barco was the proper ultimate consignee.[6]

## VIII.  CAUSES OF ACTION

## IX.  COUNT I

(Against all Defendants)
False Claims Act, 31 U.S.C. § 3729(a)(1)(G)
Improperly Avoids or Decreases Obligation to Pay ("Reverse False Claims")

183. The United States re-alleges and re-incorporates herein by reference paragraphs 1 through 182 as if fully set forth herein.

184. During the period of January 1, 2012 to December 31, 2021, all Defendants knowingly concealed or knowingly avoided or decreased an obligation to pay or transmit money to the United States.

185. First, there is a legal obligation to pay duties upon entering merchandise into the United States. Defendants knew of this responsibility and legal obligation.

186. Second, each Defendant served a role "qualifying as importer of record," including the owner of the merchandise, the purchaser, and consignee, owed due care upon making entry whether on the Entry Summary/Form 7501 or not.

---

[6] CBP made this correction on several occasions—requiring that Barco be listed on the Entry Summary/Form 7501 as ultimate consignee. As such, Barco's name begins to re-appear on the Entry Summaries/Form 7501 a handful of times beginning in 2020.

187.    Third, all Defendants knowingly decreased an obligation to pay money owing to the United States by reaching an agreement, memorialized on the cost sheets, to submit far less duties than owed.

188.    Fourth, the Chans and Chan companies knowingly concealed an obligation to pay by generating a false invoice that bore fake prices to support the fraudulently low declaration of value.  The Chans provided the fake invoice to customs brokers, agents, and third-party logistic companies to be submitted to the same to support the Entry Summary/Form 7501 submitted to the United States.

189.    Fifth, Barco concealed a legal obligation to pay money owing to the Government by removing or causing others to remove Barco's name from the Entry Summary/Form 7501 and paperwork with the Chan companies.  Even though, for the entirety of the scheme, each box imported in shipping containers bared Barco's garment tag and label, Barco's name on the shipping box, and contained merchandise trademarked by Barco's ultimate customer. Barco qualified to serve as either the importer of record or the ultimate consignee and should have been the ultimate consignee by virtue of having caused the import and being the ultimate destination in the United States.

190.    Had CBP known Defendants concealed and improperly reduced amounts owing to the United States, CBP would not have permitted entry into the United States without full payment of duties owed.

191.    By virtue of this concealment and knowingly avoidance and decrease of an obligation to pay or transmit money to the United States, the United States suffered damages and is entitled to damages to be determined at trial, plus civil penalties for each violation.

## X.    <u>COUNT II</u>

(Against all Defendants)
False Claims Act, 31 U.S.C. § 3729(a)(1)(G)
Making, Using, or Causing to be Made or Used, False Records or Statements
Material to an Obligation to Pay Money to the Government

192.    The United States re-alleges and re-incorporates herein by reference paragraphs 1 through 191 as if fully set forth herein.

193.    During the period of January 1, 2012 to December 31, 2021, all Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or

transmit money or property to the Government.

194.    First, the Chans and Barco agreed to make the bottom line as low as possible by underreporting duties owed—an understanding memorialized in the Barco cost sheets.  To achieve this aim, *i.e.* to make duties levied equal to the incorrect value on the cost sheet, a false invoice was necessary to purportedly support the fraudulently low value and duties owed.  In other words, once the parties had inked their agreement to pay incorrect duties, the only possible outcome was false statements of value on the Entry Summary/Form 7501 and a fraudulent document to support false value declared.  As the items were created at Barco's direction (via purchase order), for Barco's customers under the license and trademark of Barco and its customers, with Barco's knowledge that customs duty would be falsified, Barco's purchase from the Chan companies was the but-for cause of the under-reported customs duties.  All defendants caused to be made and used false records and false statements.

195.    Second, the Chan Defendants including the Chan companies, made the fraudulent invoice, *i.e.* the false record, that is the basis for the false statements of value on the Entry Summary/Form 7501.

196.    Third, the false record and the false statements are material to the obligation to pay the United States because the Entry Summary/Form 7501 and the underlying documents are required by CBP to support duties owed.

197.    Had CBP known the statements on the CBP 7501 regarding value were false and that the supporting invoice was fraudulent, CBP would not have permitted entry into the United States without full payment of duties owed.

198.    By virtue of the Defendants causing to be presented the false statements on the Entry Summary/Form 7501 and false records material to an obligation to pay money to the United States, the United States suffered damages and is entitled to damages to be determined at trial, plus civil penalties for each violation.

## XI.    <u>COUNT III</u>

Against all Defendants
False Claims Act, 31 U.S.C. § 3729(a)(1)(C)
Conspiracy to Violate the False Claims Act

199.    The United States re-alleges and re-incorporates herein by reference paragraphs 1

through 198 as if fully set forth herein.

200.    During the period of January 1, 2012 to December 31, 2021, all Defendants conspired to commit a violation of the FCA.  Namely, all defendants agreed to conceal or improperly avoid or reduce customs duties rightfully due to the United States (31 U.S.C. § 3729(a)(1)(G)) and further agreed to make and cause to present false records and false statements to CBP to facilitate the importation of falsely undervalued goods.

201.    First, Defendants have a decades long personal and business relationship that facilitated the conspiracy.

202.    Second, Barco solicited and encouraged the Chans to reach a lower price by providing cost sheets with Barco's target price and leaving the duty cost to be manipulated to whichever amount was necessary to reach that price or specifying to the Chans the amount of duty that would be paid, both of which impermissibly resulted in artificially reduced duties.

203.    Third, for each item of merchandise, the parties memorialized their meeting of the minds to evade duties by committing the plan to writing in a cost sheet.  The parties also discussed via email multiple times that the duties would go low enough to obtain cost savings but, as Chan company employee D.K. explained, not so low as to generate scrutiny.

204.    Fourth, all Defendants committed multiple acts in furtherance of the conspiracy including, but not limited to, preparing and utilizing the cost sheets, Barco's direct coordination with the factories, Donner's direction to his team to alter duty cost, creation of the false invoices, false statements on the Entry Summary/Form 7501 regarding value, colluding to remove Barco from the Entry Summary/Form 7501 after becoming aware of the investigation, Barco's "resdesign" of the cost sheet to create Custom FOB, the Defendants' coordination to exclude vendor profit and domestic tax from the dutiable amount, and the constant name changes of the Chan entities, including operating as "Unity inLov."

205.    Had CBP known the statements on the Entry Summary/Form 7501 regarding value were false and that the supporting invoice was fraudulent, CBP would not have permitted entry into the United States without full payment of duties owed.

206.    By virtue of the Defendants' conspiracy to violate the FCA, the United States suffered

damages and is entitled to damages to be determined at trial, plus civil penalties for each violation.

## XII.  COUNT IV

Against all Defendants
Unjust Enrichment

207.  The United States re-alleges and re-incorporates herein by reference paragraphs 1 through 206 as if fully set forth herein.

208.  This is a common law claim the United States brings against all Defendants.

209.  During the period of January 1, 2012 to December 31, 2021, all Defendants imported merchandise into the United States from the PRC and paid far fewer duties than were owed.

210.  First, Barco and the Chan Defendants agreed to a price that fraudulently underpaid duties. Barco then issued purchase orders for the Chan companies to make the goods in the PRC and import them into the United States.  The specifications for manufacture included Barco's name on the tag, Barco's style number, and the ultimate customer's trademark.  The Chan companies arranged for the goods to be delivered *directly* to Barco's warehouse from the PRC and notified Barco of the shipping container number the moment it left port in the PRC.  Then the Chan companies emailed Barco an invoice which Barco paid by wiring money to the PRC.  The parties, however, did not pay duties on any of these transactions. Instead, the parties paid significantly lower duties based on a fake value from a fake transaction

211.  By paying duties on a non-existent fraudulent transaction, both parties were unjustly enriched at the expense of the United States.  Under common law, the equities dictate, that the Defendants should make the United States whole.

## XIII.  PRAYER FOR RELIEF

The United States requests that judgment be entered in its favor against all as follows: (1) on Counts I-III (False Claims Act), for treble damage sustained by the United States, together with maximum civil penalties under the FCA and post-judgment interest; (2) Count IV (Unjust Enrichment) for the amount by which the Defendants were unjustly enriched by evading proper duties at the expense of the United States.

1

## XIV.  **JURY DEMAND**

2      The United States requests a trial by jury pursuant to Federal Rule of Civil Procedure 38.

3                                  Respectfully submitted,

4

5   Dated: April 8, 2025                 YAAKOV M. ROTH
                                         Acting Assistant Attorney General, Civil Division
6

7                                        JAMIE ANN YAVELBERG
                                         COLIN M. HUNTLEY
8
                              By:     _/s/ Elspeth A. England_____
9                                        ELSPETH A. ENGLAND
                                         Senior Trial Attorney
10                                       Commercial Litigation Branch
                                         P.O. Box 261
11                                       Benjamin Franklin Station
                                         Washington, D.C.  20044
12                                        (202) 514-8746
                                         Elspeth.A.England@usdoj.gov
13

14                                       MICHELE BECKWITH
                                         Acting United States Attorney
15
                              By:      _/s/ David E. Thiess_____
16                                       DAVID E. THIESS
                                         Assistant United States Attorney
17                                       Eastern District of California
                                         501 I Street, Suite 10-100
18                                       Sacramento, California  95814
                                          (916) 554-2700
19                                       David.Thiess@usdoj.gov

20

21

22

23

24

25

26

27

28